DEAN HELLER, SECRETARY OF STATE; NEVADA STATE MEDICAL ASSOCIATION; AND LAS VEGAS CHAMBER OF COMMERCE, APPELLANTS, v. GIVE NEVADA A RAISE, INC.; DANNY THOMPSON; PEOPLE FOR A BETTER NEVADA, A NEVADA NON-PROFIT CORPORATION; AND CARMEN CASHMAN, RESPONDENTS.

No. 43690

September 2, 2004                                    96 P.3d 732

---

[13]Hearing on S.B. 481 Before the Assembly Comm. on Judiciary, 70th Leg. (Nev., May 12, 1999).

[14]*Id.*

*Brian Sandoval,* Attorney General, *Jeff E. Parker,* Solicitor General, and *Victoria Thimmesch Oldenburg,* Senior Deputy Attorney General, Carson City, for Appellant Secretary of State Dean Heller.

*McMullen & Cain* and *E. Joe Cain* and *Samuel P. McMullen,* Henderson, for Appellant Las Vegas Chamber of Commerce.

*Michael A. Rosenauer,* Reno, for Appellant Nevada State Medical Association.

*Crowell Susich Owen & Tackes* and *Robert L. Crowell,* Carson City, for Respondents People for a Better Nevada and Carmen Cashman.

*McCracken Stemerman Bowen & Holsberry* and *Andrew J. Kahn, Richard G. McCracken,* and *Eric B. Myers,* Las Vegas, for Respondents Give Nevada A Raise, Inc., and Danny Thompson.

# OPINION

*Per Curiam:*

Article 19, Section 3(1) of the Nevada Constitution requires, among other things, that each document of a ballot-initiative petition be accompanied by an affidavit, executed under oath by a person who signed the document, attesting that the document's signatures are genuine and that the signatories were, at the time of signing, registered voters in the county in which they reside. Respondents submitted documents comprising two initiative petitions to the Nevada Secretary of State for inclusion on the November 2004 general election ballot. The Secretary then discounted thousands of signatures in the documents for failure to comply with Section 3(1) and disqualified the initiatives from the ballot. Consequently, respondents sought relief in the district court, which declared Section 3(1)'s affidavit requirements unconstitutional under the First Amendment to the United States Constitution, and ordered the Secretary to qualify the previously disqualified signatures and place the initiatives on the ballot. We affirm because Section 3(1)'s requirement that an initiative-petition document be accompanied by a signatory's affidavit impermissibly burdens political speech by either compelling the use of only registered voters as circulators or compelling unregistered circulators to be accompanied by a registered voter who is willing to sign a petition booklet and execute an affidavit under oath authenticating that booklet's signatures.

## BACKGROUND

In full, Article 19, Section 3(1) of the Nevada Constitution reads, with emphasis added:

> Each referendum petition and initiative petition shall include the full text of the measure proposed. Each signer shall affix thereto his or her signature, residence address and the name

*of the county in which he or she is a registered voter. The petition may consist of more than one document, but each document shall have affixed thereto an affidavit made by one of the signers of such document to the effect that all of the signatures are genuine and that each individual who signed such document was at the time of signing a registered voter in the county of his or her residence. The affidavit shall be executed before a person authorized by law to administer oaths in the State of Nevada.*[1]

In 1966, this court interpreted Section 3(1) to mean that an initiative-petition document, such as a signature booklet, must be excluded if it is not authenticated by a signer's affidavit.[2] Thus, if a person circulating an initiative petition wishes to authenticate a booklet's signatures, he or she must sign the booklet and execute an affidavit under oath stating that all signatures are genuine and that all signatories were, at the time of signing, registered voters. But therein lies the problem at the heart of this case: The Nevada Constitution permits only registered voters to sign an initiative petition;[3] consequently, in order for a circulator to authenticate signatures, he or she must be a registered voter. In 1999, however, the United States Supreme Court held in *Buckley v. American Constitutional Law Foundation, Inc.*[4] that the First Amendment prohibits states from requiring petition circulators to be registered voters, because such a requirement impermissibly burdens political speech by reducing the pool of potential circulators. Decisions of the United States Supreme Court are binding on Nevada courts under Article 1, Section 2 of the Nevada Constitution.

In an attempt to reconcile Section 3(1) and *Buckley,* the Secretary requires by regulations that each signature booklet be accompanied by a signer's affidavit and a circulator's affidavit.[5] Under the Secretary's official interpretation of the regulations, if the circulator is not a registered voter, he or she must have one of

[1]This version of Section 3(1) was proposed and passed by the 1960 and 1961 Legislatures and approved and ratified by voters in the 1962 general election. The need for an accompanying affidavit originated in the 1958 version as part of an initiative-originated amendment intended to "make the requirements to commence and carry through an initiative petition more strict." *Propositions to be Voted Upon in State of Nevada at General Election, November 4, 1958,* at 6.

[2]*Lundberg v. Koontz,* 82 Nev. 360, 418 P.2d 808 (1966); *see also Stumpf v. Lau,* 108 Nev. 826, 839 P.2d 120 (1992) (observing that a Section 3(1) affidavit may only be executed by a registered voter who signed the petition document).

[3]Nev. Const. art. 19, § 2(2); *id.* § 3(1).

[4]525 U.S. 182, 194 (1999).

[5]NAC 293.182; NAC 295.020.

the persons signing the booklet execute a Section 3(1) affidavit, attesting that the booklet's signatures are genuine and that each signer was a registered voter in the county of his or her residence at the time of signing.[6] The unregistered circulator must then execute a circulator's affidavit, also attesting to genuineness and residency, and adding the circulator's address, that the circulator is eighteen years of age or older and personally circulated the document, and that all signatures were affixed in the circulator's presence. To alleviate the difficulty inherent in an unregistered circulator having to retain a different registered voter throughout the course of each booklet's signing, the Secretary's interpretation provides that a booklet signer may sign multiple booklets (on the first signature line) and accompanying affidavits, and need not be present as others sign the booklets, so long as the affiant's genuineness and residency beliefs are based on "the uncontradicted assertion of the circulator."[7] With the initiative-petition framework explained, the factual background of this case follows.

Respondents Give Nevada A Raise, Inc., and Danny Thompson (collectively, GNR) sponsored a ballot initiative calling for an increase in Nevada's minimum wage. Although GNR gathered more than the 51,337 signatures needed to ensure placement on the November 2004 general election ballot, the Secretary discounted thousands of signatures in booklets that were not each accompanied by "a valid affidavit signed by a registered voter who had signed that particular [booklet]." Consequently, GNR lacked sufficient signatures to qualify its ballot initiative. Respondents People for a Better Nevada and Carmen Cashman (collectively, PBN) also lost necessary qualifying signatures for their "Stop Frivolous Lawsuits and Protect Your Legal Rights Act" ballot initiative due to omitted signers' affidavits.

On July 12, 2004, GNR filed a complaint for declaratory, injunctive and writ relief against the Secretary, seeking to compel the minimum-wage initiative's placement on the ballot. GNR alleged that, although its petition circulators had not signed the petition, they had signed affidavits authenticating booklet signatures, and that requiring affidavits executed by booklet signers violates the First Amendment. PBN intervened against the Secretary, stating that it had lost signatures under the same circumstances as GNR, and that it was adopting GNR's complaint. The Nevada State Medical Association and the Las Vegas Chamber of Commerce

---

[6]Interpretation of the Secretary of State #00-01 (Jan. 24, 2000).

[7]The Secretary's interpretation directly conflicts with NRS 295.150(2) when the Section 3(1) affidavit is for a referendum petition on a legislative act pertaining to a particular county. In that instance, the statute requires that the affidavit be based on "information and belief," and the signatures must have been executed in the affiant's "presence."

also intervened, identifying an interest in defeating PBN's initiative petition.

Following a bench trial, the district court concluded that Section 3(1)'s affidavit requirements could withstand neither *Buckley's* strict scrutiny nor a "lesser standard of review." Consequently, the district court declared the Section 3(1) affidavit requirements unconstitutional, and ordered the Secretary to qualify the signatures he had stricken from GNR's and PBN's initiative petitions and to place the initiatives on the ballot. The Secretary, Medical Association and Chamber of Commerce appealed.[8]

## DISCUSSION

### I. Buckley v. American Constitutional Law Foundation, Inc.

The First Amendment to the United States Constitution protects speech, which, as observed in *Buckley,* includes the circulation of initiative petitions.[9] The parties, however, dispute *Buckley's* applicability to the instant case. In *Buckley,* the Supreme Court considered the constitutionality of a state statute that, among other things, required initiative-petition circulators to be registered voters.[10] In deeming this requirement unconstitutional, the Supreme Court noted that petition circulation is "core political speech, because it involves interactive communication concerning political change,"[11] and that "First Amendment protection for such interaction . . . is at its zenith."[12] The Court rejected the state's argument that the registration requirement only slightly limited speech because it is "exceptionally easy to register," reasoning that ease of registration "does not lift the burden on speech at petition circulation time,"

---

[8]As the district court issued declaratory and permanent injunctive relief in the absence of any factual dispute, we review the district court's judgment de novo. *See University System v. DR Partners,* 117 Nev. 195, 18 P.3d 1042 (2001) (stating that, in the absence of disputed facts, preliminary and permanent injunctions are reviewed de novo); *County of Clark v. Upchurch,* 114 Nev. 749, 961 P.2d 754 (1998) (observing that a district court's decision to render a determination in a declaratory relief action is reviewed for abuse of discretion, but that a district court's issuance of declaratory relief based on statutory construction is reviewed de novo).

[9]525 U.S. at 186-87. The First Amendment applies to the states through the Fourteenth Amendment. *Goldstein v. Chestnut Ridge Volunteer Fire Co.,* 218 F.3d 337, 340 n.1 (4th Cir. 2000).

[10]The registration requirement originated from a voter-approved amendment to the Colorado Constitution. *Buckley,* 525 U.S. at 190.

[11]*Id.* at 186 (quotation marks omitted).

[12]*Id.* at 187 (quotation marks omitted).

and that circulators may wish to remain unregistered as a form of "political thought and expression."[13] Additionally, the Court observed that the statute's requirement of a circulator's affidavit was responsive to the state's concern "in policing lawbreakers among petition circulators."[14] Finally, the Court stated that it was applying traditional strict scrutiny analysis: "state regulations impos[ing] severe burdens on speech . . . [must] be narrowly tailored to serve a compelling state interest."[15] Accordingly, the Court concluded that, notwithstanding a state's "considerable leeway" in "protect[ing] the integrity and reliability of the initiative process,"[16] the registration requirement violated the First Amendment by limiting the number of voices available to convey the initiative proponents' message, thereby reducing the size of the reachable audience without furthering the state's interests in administrative efficiency, fraud detection and informing voters.[17]

Consequently, if Section 3(1) severely burdens political speech, we apply strict scrutiny; otherwise, "less exacting review" is warranted and "important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions."[18]

## II. Section 3(1) severely burdens political speech

We begin our Section 3(1) analysis cognizant that a state, although it has "considerable leeway to protect the integrity and reliability of the initiative process,"[19] may not, after *Buckley,* require circulators to be registered voters. We also recognize that Section 3(1), on its face, contains no such direct requirement. But the reality of Section 3(1)'s operation tells a different story. In Nevada, registered voters may circulate initiative petitions and provide the necessary Section 3(1) affidavits. Unregistered persons may also circulate petitions, but to obtain the Section 3(1) affidavits, they must (1) convince a registered voter who signed a particular petition booklet to execute an affidavit, attesting that the booklet's signatures are genuine and that the signatories were, at the time of signing, registered voters in their county of residence; and (2) arrange for execution to take place before a notary. These extra

---

[13]*Id.* at 195.

[14]*Id.* at 196.

[15]*Id.* at 192 n.12 (quotation marks omitted) (alternation in original).

[16]*Id.* at 191.

[17]*Id.* at 194-95.

[18]*Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358 (1997) (quotation marks omitted).

[19]*Buckley,* 525 U.S. at 191.

steps, required in the Section 3(1) process for unregistered circulators, impose a burden on political speech that is no less severe than the direct registration requirement invalidated in *Buckley*. Specifically, if the Section 3(1) affidavit is to have any value at all as a means of ensuring the integrity and reliability of the circulation process, it must be executed by someone who participated in gathering the signatures. Thus, unregistered circulators must be accompanied at all times by a registered voter who is willing to sign the petition booklet and execute a Section 3(1) affidavit under oath for that booklet, attesting that the signatures are genuine and that the signatories were, at the time of signing, registered voters in the county of their residence.

Under Section 3(1), then, circulation may be accomplished either by a registered voter or a two-person team composed of an unregistered person and a registered voter. In either instance, Section 3(1) mandates the use of circulators who are registered voters and who are willing to sign the petition. If unregistered circulators are unable to locate a registered-voter companion, their only alternative, if they wish to participate in the circulation process, is to register to vote. Requiring a circulator to be a registered voter is expressly precluded by *Buckley,* and requiring an unregistered circulator to be accompanied by a registered voter fails under *Buckley*'s reasoned disapproval of circulation restrictions that "significantly inhibit communication with voters about proposed political change."[20] Requiring two persons to circulate each booklet of an initiative petition cuts in half the number of voices available to convey the initiative-petition's political message and reduces the size of the reachable audience.[21] This point is buttressed by evidence offered in the district court that initiative-petition sponsors are unlikely to use circulators who need a companion to authenticate signatures.

At least one other court has found a severe burden in a two-person circulation-team requirement. In *Morrill v. Weaver,*[22] the federal district court interpreted a Pennsylvania statute that required signature booklets for a candidate's nomination to be authenticated by the affidavit of a "qualified elector" who resided in the electoral district in which signatures were being gathered. The district court ruled that if "qualified elector" were interpreted to mean "registered voter," then both unregistered circulators and registered circulators from other districts would be unable to authenticate booklets unless accompanied by a registered voter from

---

[20]525 U.S. at 192.

[21]*See id.* at 194-95.

[22]224 F. Supp. 2d 882, 886, 900 (E.D. Pa. 2002).

the proper electoral district.[23] The district court concluded that a resident-companion requirement would constitute a severe burden on speech that was not necessary to achieve any compelling state interest. Accordingly, the district court declared that "qualified electors" "need not be registered voters" and invalidated the residency restriction.[24]

As to Section 3(1), we similarly conclude that a team-circulation option is severely burdensome. But unlike the statute in *Morrill,* Section 3(1)'s affidavit requirement is not capable of a constitutional construction.[25] We note, too, that the severity of Section 3(1)'s burden on speech is exacerbated by NRS 295.055(2), which states, "Each document of the petition must bear the name of a county, and only registered voters of that county may sign the document." As Section 3(1) requires an affiant to be a registered voter in the county of his or her residence, the tandem effect of Section 3(1) and NRS 295.055(2) is to permit only voters registered in the county of circulation to serve as Section 3(1) affiants. Thus, the registered-voter member of a two-person circulation team must be from the county of circulation, not merely from anywhere in Nevada. Even a registered circulator needs a companion to provide a Section 3(1) affidavit if the circulator is gathering signatures in a county in which she does not reside. Consequently, we conclude that Section 3(1) severely burdens

---

[23]*Id.* at 894, 898.

[24]*Id.* at 900, 902; *accord Chandler v. City of Arvada, Colorado,* 292 F.3d 1236 (10th Cir. 2002) (declaring unconstitutional a city ordinance limiting initiative, referendum and recall petition circulation to city residents); *Molinari v. Powers,* 82 F. Supp. 2d 57, 75-76 (E.D.N.Y. 2000) (invalidating a New York statute that allowed a circulator to witness signatures only in the political subdivision of his or her residence, unless the circulator was a notary public or commissioner of deeds), *cited approvingly in Lerman v. Board of Elections in City of New York,* 232 F.3d 135 (2d Cir. 2000); *KZPZ Broadcasting v. Black Canyon Citizens,* 13 P.3d 772 (Ariz. Ct. App. 2000) (invalidating a local residency restriction on referendum petition circulation).

[25]In addition to declaring Section 3(1)'s affidavit requirements unconstitutional, the district court offered a construction that would purportedly avoid any conflict with the First Amendment. In relevant part, Section 3(1) states:

> The petition may consist of more than one document, but each document shall have affixed thereto an affidavit made by one of the *signers of such document* . . . .

(Emphasis added.) The district court proposed construing " 'signers of such document' to include someone who has signed one of two affidavits at the end of the petition rather than having signed the body of the petition." But this construction poses a circular exercise, as it requires each document to be accompanied by "an affidavit made by one of the signers of such [affidavit]." Further, "such document" clearly refers to documents that comprise the petition, and not to "affidavit[s]."

political speech, and that the burden is exacerbated by NRS 295.055(2).

Although we fully recognize our duty to construe the Nevada Constitution in a manner that will preserve that venerable document's text,[26] the Secretary's official interpretation does little to alleviate the burden on speech. When that interpretation is inserted into the mix of Section 3(1) and NRS 295.055(2), a circulator who is not registered to vote need not be accompanied by a registered voter, so long as the circulator can locate a registered voter from the county of circulation who is willing to sign all of the circulator's booklets and provide authenticating affidavits based solely on the circulator's representations of genuineness and residency. Even if, as appellants urge, we could somehow interpret Section 3(1) as permitting an affidavit only on information and belief, based solely on the circulator's representations, such an affidavit would be meaningless and contrary to the reason for Section 3(1)'s amendment in 1958, which was to "make the requirements to commence and carry through an initiative petition more strict."[27] Finally, we note that requiring a circulator to convince a booklet signer, who may be a complete stranger, uncertain about the initiative-petition circulation process, with absolutely no familiarity with the booklet's signatories, to execute an authenticating affidavit under oath imposes a severe burden in itself.

We therefore apply strict scrutiny: Section 3(1) must be narrowly tailored to serve a compelling state interest.

*III. Section 3(1) is not narrowly tailored*

Appellants identify, as compelling, Nevada's interests in ensuring "that the initiative signature gathering process is fair, honest, reliable and verifiable." For purposes of this appeal, we will assume that "policing the integrity" of the initiative-petition process is a compelling state interest.[28] Consequently, our inquiry is limited to determining whether Section 3(1) is narrowly tailored. Regulation of constitutionally protected speech is considered narrowly tailored only if it burdens no more speech than is necessary to achieve a compelling interest.[29] Thus, we must consider the alternatives to Section 3(1)'s burdens and the degree to which those burdens achieve, serve or advance the State's interest.[30]

[26]*State ex rel. Herr v. Laxalt,* 84 Nev. 382, 441 P.2d 687 (1968).

[27]*Propositions to be Voted Upon in State of Nevada at General Election, November 4, 1958,* at 6. *See generally supra* note 1.

[28]*Chandler,* 292 F.3d at 1241.

[29]*Krislov v. Rednour,* 226 F.3d 851, 863 (7th Cir. 2000).

[30]*See Burk v. Augusta-Richmond County,* 365 F.3d 1247 (11th Cir. 2004).

In *Buckley,* the Supreme Court noted that Colorado had measures in place that would have protected the integrity of the initiative petition process without requiring circulators to be registered voters. For instance, Colorado required a circulator to submit an affidavit reciting the circulator's address, criminalized the forging of initiative petitions, voided initiative-petition signatures if the circulator violated circulation laws, and required initiative sponsors to disclose who pays circulators and how much.[31] Nevada has implemented many of these measures,[32] including the circulator's affidavit,[33] which reveals more identifying information than a Section 3(1) affidavit.[34] Thus, less restrictive alternatives exist to ensure the petition process's integrity than requiring a Section 3(1) affidavit.

As to the degree to which a signer's affidavit advances the State's interest in guarding against corruption of the initiative process, appellants do not address the fact that the person most competent to attest to the genuineness of signatures and the residency of signatories may be an unregistered circulator (or a registered, nonresident circulator), who cannot sign the Section 3(1) affidavit. And even if we were to follow appellants' suggestion that Section 3(1) be somehow interpreted to allow a Section 3(1) affiant to rely on the ''uncontradicted assertion of the circulator'' as to genuineness and residency, the value of an affidavit not based on personal knowledge is, as noted above, highly suspect and directly contravenes the voters' desire in 1958 to ''make the requirements to commence and carry through an initiative petition more strict.'' Thus, based upon the record before us, Section 3(1)'s requirement that each petition booklet be accompanied by the affidavit of a registered voter who signed that booklet does not tangibly advance the State's interests in ensuring the integrity and reliability of the initiative process and therefore is not narrowly tailored.

## CONCLUSION

Article 19, Section 3(1)'s requirement that an initiative-petition document be accompanied by a signatory's affidavit severely bur-

---

[31]*Buckley,* 525 U.S. at 196, 205.

[32]*See, e.g.,* NRS 205.125 (criminalizing the forgery of signatures on referendum and initiative petitions); NRS 294A.150 (requiring initiative sponsors to report contributions over $100); NRS 294A.220 (requiring initiative sponsors to report expenditures over $100).

[33]The parties have not challenged and we do not comment on the validity of the Secretary's regulations that require a circulator's affidavit.

[34]*Compare* Nev. Const. art. 19, § 3(1) (requiring a signer's affidavit attesting to genuineness of signatures and residency of signatories), *with* NAC 293.182 (requiring a circulator's affidavit revealing the circulator's address and recitations concerning genuineness of signatures, residency of signatories, the

dens speech by either compelling the use of only registered voters as circulators or compelling unregistered circulators to be accompanied by a registered voter who is willing to sign a petition booklet and execute an affidavit under oath authenticating that booklet's signatures. The burden is neither alleviated by the Secretary's official interpretation nor warranted by the State's interest in ensuring the integrity and reliability of the initiative-petition process given that (1) the State has other measures in place to guard the process from corruption, and (2) the State's interests are not tangibly advanced by the Section 3(1) affidavit. Consequently, Section 3(1) does not survive strict constitutional scrutiny.[35]

Accordingly, we affirm the district court's judgment ordering the Secretary to qualify previously disqualified signatures and to place GNR's and PBN's initiatives on the ballot.

MAUPIN, J., concurring:

Recognizing that political speech is the most vital ingredient to a healthy and evolving democracy, and following the dictates of the United States Supreme Court in *Buckley v. American Constitutional Law Foundation, Inc.,*[1] I agree with the majority that Nevada's initiative petition verification requirements, in their practical application, run afoul of the First Amendment.

I write separately to address statements in the record below apparently ridiculing the administrative measures taken by the Secretary of State to comply with the exacting dictates of *Buckley.* To me, the severity of the criticism was not justified. It was incumbent upon the Secretary to attempt to effect compliance with a very strict ruling handed down by the United States Supreme Court. It was also incumbent upon him to test the validity of these measures before this court. Given the restraints imposed by the *Buckley* decision, and given the express language of Article 19, Section 3(1) of the Nevada Constititution, the task of effecting compliance was fraught with considerable difficulty. In my view, the ingenuity and vigor of the legal arguments offered in support of and in opposition to these measures demonstrate that the measures were neither unintelligent nor unwise. They simply fell short of federal constitutional muster.

---

circulator's age of majority, and fact of personal circulation), *and* NAC 295.020(2)(b) (same).

[35]We note that local residency requirements, like the one found in NRS 295.055(2), are constitutionally infirm. *See supra* note 24.

[1]525 U.S. 182, 194 (1999).