256 P.3d 1 (2011)
NEVADA STATE DEMOCRATIC PARTY; and Ross Miller, in his Capacity as Secretary of State for the State of Nevada, Appellants,
v.
NEVADA REPUBLICAN PARTY; and David Buell, an Individual, Respondents.
No. 58404.
Supreme Court of Nevada.
July 5, 2011.
*2 Jones Vargas/Las Vegas
Perkins Coie, LLC
Griffin Rowe & Nave
Attorney General/Carson City
O'Mara Law Firm, P.C.
Parsons Behle & Latimer/Reno

ORDER OF AFFIRMANCE
This is an appeal from a district court order granting a permanent injunction in a special election matter. First Judicial District Court, Carson City; James Todd Russell, Judge. At issue is the manner of selecting the major political party candidates who may appear as such on the ballot in a special election to fill a vacancy in Nevada's House of Representatives seats. Do Nevada's election laws require the central committee for each major political party to select a single candidate apiece, as provided in NRS 293.165(1)? Or do they allow members of the major political parties to self-nominate pursuant to NRS 304.240(1), with the result that each major party may have multiple candidates?
Read in isolation from the other election statutes it incorporates, NRS 304.240(1) is opaque enough to allow "yes" answers to both questions. Standing alone, therefore, it is ambiguous. But conventional rules of statutory construction require NRS 304.240(1) to be read in light of the election laws it incorporates and the caselaw construing those laws. Since at least 1954 Nevada has equated a vacancy in office with a vacancy in major party nomination and turned to NRS 293.165(1) (or its predecessor, 1943 Nev. Compiled Laws § 2429 (1943-1949 Supp.)), and the major political parties' central committees to designate their candidate of choice when a vacancy in nomination occurs. See Brown v. Georgetta, 70 Nev. 500, 275 P.2d 376 (1954). If the 2003 Legislature that enacted NRS 304.240(1) had intended to abandon this long-settled practice when it provided for special elections to fill United States House of Representatives vacancies, it seems reasonable to conclude that it would have done so explicitlyparticularly given that the self-nominating "free for all" or "ballot royale" approach is unusual and has not been adopted federally, 2 U.S.C. § 8 (2006), or in more than two jurisdictions. For these reasons, and in the absence of an express, contrary statutory directive or Secretary regulation, we conclude that NRS 304.240(1) must be read as incorporating NRS 293.165(1) in determining the manner in which a candidate of a major political party is selected to stand *3 for special election to fill a vacancy in the United States House of Representatives. We therefore affirm, albeit for different reasons, the injunction issued by the district court.

RELEVANT FACTS
On May 9, 2011, Nevada Governor Brian Sandoval issued a proclamation announcing that the Honorable Dean Heller had resigned from the United States House of Representatives, creating a vacancy in Nevada's Second Congressional District. To fill the remainder of Heller's unexpired term, Governor Sandoval's proclamation ordered that a special election be held on September 13, 2011. The Governor's proclamation also stated that the special election "shall conform with all applicable federal and state laws as interpreted by the Secretary of State, the State's chief elections officer."
A week before Governor Sandoval's proclamation, on May 2, 2011, appellant Nevada Secretary of State Ross Miller issued an interpretation of Nevada's election laws governing the proceedings for conducting the special election to fill a vacancy in the United States House of Representatives. Focusing primarily on NRS 304.240, Secretary Miller concluded that major party candidates could self-nominate in a House of Representatives special election, thereby placing themselves on the ballot as a major political party candidate by filing a declaration or acceptance of candidacy, regardless of whether the major political party approved of the affiliation.
Respondents Nevada Republican Party and David Buell (collectively, the Republican Party) sued to challenge Secretary Miller's interpretation. They sought to enjoin its implementation on the ground that it precluded a major political party's central committee from nominating one candidate to represent the party on the special election ballot, violating NRS 293.165(1). Intervening in support of Secretary Miller was appellant Nevada State Democratic Party.
After an expedited hearing, the district court entered a written order resolving the case. It granted a permanent injunction requiring that, for a person to be a "candidate of a major policy party" eligible for nomination under NRS 304.240(1), he or she had to have been designated as such by the party's central committee pursuant to NRS 293.165. This appeal followed, which we have expedited to accommodate the special election schedule.

STATUTES INVOLVED IN THIS APPEAL

NRS 30U.200 through .250
This appeal involves a special election under NRS 304.200 through .250. The 2003 Nevada Legislature enacted these statutes to address filling vacancies in Nevada's United States House of Representative seats. The impetus for this legislation was the September 11, 2001, terrorist attacks. See Hearing on A.B. 344 Before the Assembly Comm. on Elections, Procedures, and Ethics, 72d Leg. (Nev., March 27, 2003). "Since their realization that on the morning of September 11, 2001, United Airlines Flight 93 was headed toward downtown Washington, D.C., with the objective of destroying the Capitol building, congressional leaders and outside policymakers [began] asking how the federal government would have continued operating if the Flight 93 hijackers had successfully completed their mission." John Bryan Williams, How to Survive a Terrorist Attack: The Constitution's Majority Quorum Requirement and the Continuity of Congress, 48 Wm. & Mary L.Rev. 1025, 1027 (2006) (footnote omitted). Unlike Senate vacancies, which can be filled by gubernatorial appointments, see U.S. Const, amend. XVII, the United States Constitution requires the House to replenish its seats through elections. See U.S. Const, art. I, § 2, cl. 4. This led the House on October 2, 2002, to pass a resolution stating that, "it is the sense of the House of Representatives that each state should examine its existing statutes, practices, and procedures governing special elections so that, in the event of a catastrophe, vacancies in the House of Representatives may be filled in a timely fashion." H.R. Res. 559, 107th Cong. (2002).
NRS 304.200 through .250 answered these calls. NRS 304.230 is the centerpiece statute. It mandates that the Governor call a *4 special election whenever a vacancy in the House of Representatives occurs and sets short time frames for doing so.[1] The exact time frames depend on whether the reason for the vacancy is a "catastrophe" involving multiple simultaneous vacancies, see NRS 304.210
NRS 304.240(1) sets forth the process for candidate nomination and placement on the ballot. This statute, on which Secretary Miller's interpretation rests and is the focus of this appeal, reads in full as follows:
If the Governor issues an election proclamation calling for a special election pursuant to NRS 304.230, no primary election may be held. Except as otherwise provided in this subsection, a candidate must be nominated in the manner provided in chapter 293 of NRS and must file a declaration or acceptance of candidacy within the time prescribed by the Secretary of State pursuant to NRS 293.204, which must be established to allow a sufficient amount of time for the mailing of election ballots. A candidate of a major political party is nominated by filing a declaration or acceptance of candidacy within the time prescribed by the Secretary of State pursuant to NRS 293.204. A minor political party that wishes to place its candidates on the ballot must file a list of its candidates with the Secretary of State not more than 46 days before the special election and not less than 32 days before the special election. To have his or her name appear on the ballot, an independent candidate must file a petition of candidacy with the appropriate filing officer not more than 46 days before the special election and not less than 32 days before the special election.
NRS 304.200 through .250 do not give details beyond those contained in NRS 304.230 and NRS 304.240. Instead, they rely on NRS Chapter 293. Thus, NRS 304.240(2) reiterates NRS 304.240(1) and states: "Except as otherwise provided in NRS 304.200 to.250 . . . [t]he [special] election must be conducted pursuant to the provisions of chapter 293 of NRS," adding that "[t]he general election laws of this State apply to the election." See also NRS 304.040 ("Except as otherwise provided in NRS 304.200 to 304.250, inclusive, party candidates for Representative in Congress shall be nominated in the same manner as state officers are nominated"); NRS 293.167 ("Party candidates for United States Senator and Representative in Congress shall be nominated in the same manner as state officers are nominated.").
Finally, NRS 304.250 provides that "The Secretary of State shall adopt such regulations as are necessary for conducting elections pursuant to the provisions of NRS 304.200 to NRS 304.250." See also NRS 293.124; NRS 293.247. Although we have the Secretary of State's May 2, 2011, interpretation, no regulations have been adopted under NRS 304.250.

NRS Chapter 293
"Except as otherwise provided" by their terms, NRS 304.200 through .250 incorporate NRS chapter 293. NRS 293.165(1) reads in pertinent part as follows: "[A] vacancy occurring in a major . . . political party nomination for a partisan office may be filled by a candidate designated by the party central committee of the county or State, as the case may be, of the major political party. . . ." Although "[t]he provisions of NRS 293.175 to 293.203, inclusive, do not apply to [s]pecial elections to fill vacancies," NRS 293.175(5)(a), NRS 293.165(1) falls outside the range of excluded statutes and thus presumptively applies, unless in conflict with NRS 304.240(1).

ANALYSIS
In the absence of any factual disputes, this court reviews a district court's issuance of a permanent injunction de novo. Secretary of State v. Give Nevada A Raise, 120 Nev. 481, 486 n. 8, 96 P.3d 732, 735 n. 8 (2004). It is well established that, when interpreting a statute, the language of a statute should be given its plain meaning. We the People Nevada v. Secretary of State, 124 *5 Nev. 874, 881, 192 P.3d 1166, 1170-71 (2008). Thus, when a statute is facially clear, a court should not go beyond its language in determining its meaning. McKay v. Bd. of Supervisors, 102 Nev. 644, 648, 730 P.2d 438, 441 (1986); see Las Vegas Taxpayer Comm. v. City Council, 125 Nev. 17, ___, 208 P.3d 429, 437 (2009) (explaining that a statute's meaning is plain when it is "facially clear"). A statute is ambiguous if it "is capable of being understood in two or more senses by reasonably informed persons." McKay, 102 Nev. at 649, 730 P.2d at 442. If a statute is ambiguous or lacks plain meaning, "a court should consult other sources such as legislative history, legislative intent and analogous statutory provisions." State, Div. of Insurance v. State Farm, 116 Nev. 290, 294, 995 P.2d 482, 485 (2000).

NRS 304.240(1) lacks the competing plain meanings ascribed to it by the parties and is ambiguous
On appeal, the Nevada State Democratic Party and Secretary Miller argue that NRS 304.240(1)'s plain language compels Secretary Miller's interpretation. They contend that the statute directs that the NRS Chapter 293 general election laws apply except to the extent that NRS Chapter 304 provides otherwise, and that NRS 304.240 expressly provides the procedure for nomination and placement on the special election ballot of major party candidates through a process of self-nomination, thereby eliminating any need to resort to NRS Chapter 293 on these issues. This construction, though arguably following the statute's plain language regarding the nomination process, necessitates interpretation regarding how the member of a major political party comes to be "a candidate of a major political party" who can be "nominated" by filing a declaration or acceptance of candidacy. It also does not address placement of the major political party candidate on the special election ballot. NRS 304.240(1). The statute expressly provides procedures for placement on the ballot for minor political party candidates and independent candidates, id., yet, in stark contrast, the statute does not provide any plain method for major political party candidates' placement on the ballot. Id.
To fill these statutory gaps, the Nevada State Democratic Party and Secretary Miller ask this court to look to NRS Chapter 293's primary election laws, which' provide the means by which, in partisan elections, a major political party nominates its candidates and they automatically gain placement on the general election ballot. But NRS 304.240(1) directly states that no primary election is to be held, thus calling into question the relevancy of relying on primary election statutes. See also NRS 293.175(5)(a) (stating that certain NRS Chapter 293 election laws addressing major political primary elections shall not apply to special elections to fill vacancies). The argument also fails to recognize that, when a vacancy in nomination via primary occurs in a partisan race, a major political party candidate is "designated" by the party central committee, not "nominated." See NRS 293.165(1). Thus, the Nevada State Democratic Party's and Secretary Miller's plain-meaning interpretation is unpersuasive.[2]
Likewise, we are not convinced that NRS 304.240(1) carries the "plain meaning" the Republican Party ascribes to it. NRS 304.240(1) does not, by its terms, direct that a major political party's central committee designate a single candidate. Granted, NRS 304.240(1) directs that NRS Chapter 293 apply, thereby incorporating NRS 293.165(1), which addresses the filling of vacancies in nomination for major and minor party candidates in partisan elections and provides a procedure for party central committee designation of a single candidate. But NRS 304.240(1) in relevant part provides that "[a] *6 candidate of a major political party is nominated by filing a declaration or acceptance of candidacy. . . ." The use of the term "a candidate" rather than "the candidate," suggests multiple candidates for a particular major political party and creates enough reservation in our minds that we are unable to read NRS 304.240(1) as clearly and unambiguously contemplating the application of NRS 293.165(1). Further, NRS 293.165(1) and NRS 304.240(1) provide different procedures for minor political parties, thereby casting doubt on any asserted plain and unambiguous harmony between the two statutes.
Accordingly, we conclude that NRS 304.240(1) is ambiguous, as it is unclear from its language the extent to which NRS Chapter 293 is intended to apply to special elections.

Deference to the Secretary of State's interpretation of NRS 304.240(1) is not appropriate
The Nevada State Democratic Party and Secretary Miller alternatively argue that if this court concludes that NRS 304.240(1) is ambiguous, we should defer to the Secretary of State's official interpretation of the statute, as under Nevada law, the Secretary of State is the chief elections officer and in this instance he has provided a reasonable interpretation of NRS 304.240 that tracks the statute's language. The Republican Party counters that if the statute is ambiguous, this court should not defer to Secretary Miller's interpretation since he fails to reasonably apply various election statutes set forth in NRS Chapter 293.[3]
This court has noted that it will, when appropriate, defer to a Secretary of State's interpretation of an election statute. See Independent American Party v. Lau, 110 Nev. 1151, 1154-55, 880 P.2d 1391, 1393 (1994) (noting deference to the Secretary of State as a constitutional officer in the interpretation of an ambiguous election statute but declining to apply deference when the plain language of the election statute contradicted the Secretary's interpretation); State v. Brodigan, 35 Nev. 35, 39, 126 P. 680, 682 (1912) (explaining that courts will give weight to the Secretary of State's interpretation of an election statute but suggesting that deference should not be applied when the Secretary of State had interpreted the law differently in the past without a corresponding change in the law to justify reversing its position). Since 2003, the Secretary of State was required to adopt regulations to conduct special elections to fill vacancies in Nevada's representation in the United States House of Representatives. See NRS 304.250 (stating that "[t]he Secretary of State shall adopt such regulations as are necessary for conducting elections pursuant to the provisions of NRS 304.200 to 304.250, inclusive" (emphasis added)) (effective May 21, 2003). The Legislature, then, specified the manner by which the statute must be interpreted by the Secretary. This choice, between regulations and interpretations, is an important distinction because NRS 293.247 requires that all elections, including special elections, be conducted under regulations in effect as of December 31 in the year preceding the special election.[4] Therefore, the Secretary's interpretation *7 of NRS 304.240 published on May 2, 2011, was an insufficient method to respond to NRS 304.250's mandate, despite the Secretary's general authority as Nevada's chief elections officer. As the mandatory regulations were never promulgated, deference to the Secretary's interpretation of NRS Chapter 304 is not appropriate. Cf. Jefferson v. U.S., 546 F.3d 477 (7th Cir.2008) (noting that the Internal Revenue Service's failure to promulgate regulations when mandated to do so by Congress could result in an ambiguous statute's nonenforcement). Thus, interpretation of NRS 304.240(1) requires our review of its language, history, and analogous election statutes.

When the Legislature enacted NRS 304.240(1) it is presumed to have had knowledge of this court's construction of related election law statutes
Where a statute lacks plain meaning, this court will consult legislative history, related statutes, and context as interpretive aids. State, Div. of Insurance v. State Farm, 116 Nev. 290, 294, 995 P.2d 482, 485 (2000); see also Leven v. Frey, 123 Nev. 399, 405, 168 P.3d 712, 716 (2007) (stating that an ambiguous statute can be interpreted by "examining the context and the spirit of the law or the causes which induced the legislature to enact it. The entire subject matter and policy may be involved as an interpretive aid" (internal quotations omitted)). Here, the legislative history says nothing about the selection of major political party candidates for a House of Representatives special election. Thus, we look to this court's construction of other, similar, election laws for filling congressional vacancies.
In Brown v. Georgetta, this court reviewed a permanent injunction restraining the Washoe County clerk from placing on the upcoming general election ballot the names of Alan Bible, Democratic candidate for the office of United States Senator, and Ernest Brown, Republican, candidate for the same office, to fill the unexpired term of the deceased United States Senator Pat McCarran. 70 Nev. at 501, 275 P.2d at 376. As Nevada Governor Charles H. Russell had already appointed Brown to fill the vacancy created by Senator McCarran's death, the main question before the court was whether Brown's appointment was for the entire remainder of Senator McCarran's unexpired term or only the period until the upcoming biennial electionwith the winner of the election contest involving Bible and Brown serving the remainder of Senator McCarran's unexpired term.[5]Id. at 501, 275 P.2d at 376-77. In the event that the term of Brown's appointment was for the latter, leading up to a scheduled general election, both Bible and Brown had been named as Senate candidates by the respective parties' central committees pursuant to 1929 Nevada Compiled Laws section 2429 (Supp. 1943-49). Brown, 70 Nev. at 501, 275 P.2d at 376. Section 2429 provided in part that "[vacancies occurring after the holding of any primary election shall be filled by the party committee of the county, district or state, as the case may be." Brown, 70 Nev. at 508, 275 P.2d at 380.
Addressing Nevada Compiled Laws section 2429, the court considered whether the statute permitted the party central committee to select Brown and Bible as candidates for vacancies arising from a vacancy in office, for which no primary had taken place, was limited to vacancies in the primary nomination *8 itself. 70 Nev. at 508, 275 P.2d at 380. The court rejected the linguistic distinction between "vacancy in office" and "vacancy in nomination," id. at 509, 275 P.2d at 380, citing Ex Rel. Penrose v. Greathouse, 48 Nev. 419, 423, 233 P. 527, 529 (1925), where the court reasoned that there was no meaningful distinction between a vacancy, such as one caused by a death, and a vacancy in nomination, as contemplated by Nevada election laws.[6]Brown, 70 Nev. at 509, 275 P.2d at 380.
Nevada Compiled Laws section 2429 was ultimately superseded by the enactment of NRS 293.165.[7] Like section 2429, NRS 293.165 addresses vacancies in nomination and permits the designation of a major political party's candidate by the party's central committee to fill a vacancy in nomination, whether it arises from a vacancy in office or otherwise. When the Legislature enacted NRS 304.240(1), neither Brown nor Penrose was abrogated. Accordingly, we must presume that the Legislature was aware of our construction in Brown that Nevada Compiled Laws section 2429 applied to vacancies in office. See Nevada-Douglas Co. v. Berryhill, 58 Nev. 261, 270, 75 P.2d 992, 995 (1938) (recognizing that, at the time of enactment, the Legislature is presumed to have knowledge of judicial construction of a prior statute). As such, it is reasonable for this court to conclude that the Legislature enacted NRS 304.240 with the understanding that NRS 293.165 could be applied to a vacancy in office. This conclusion is further supported by the fact that NRS 304.240(l)'s language, stating that "a candidate must be nominated in the manner provided in chapter 293 of NRS," references, by implication, to NRS 293.165.

NRS 304.240(1) contemplates application of NRS 293.165(1)
Reading these two statutes together, we conclude that NRS 304.240(1) anticipates a two-step process: a designation step, whereby a person becomes "a candidate of a major political party," and a placement-on-the-ballot or special-election nomination step. For the designation step, we read NRS 304.240(1) as applying the procedure set forth in NRS 293.165(1). Such a reading provides meaning to the statute's incorporation of NRS Chapter 293 and Nevada's general election laws, of which NRS 293.165(1) is one. Thus, the first step in the NRS 304.240(1) analysis is to look to the procedure established in NRS 293.165 for filling a vacancy in a major political party nomination that ordinarily would have been filled by primary. The second step addresses the separate issue of placement on the ballot for the special election. The last three sentences in NRS 304.240(1) read that:
A candidate of a major political party is nominated by filing a declaration or acceptance of candidacy within the time prescribed by the Secretary of State pursuant to NRS 293.204.[2] A minor political party that wishes to place its candidates on the ballot must file a list of its candidates with the Secretary of State not more *9 than 46 days before the special election and not less than 32 days before the special election. [3] To have his or her name appear on the ballot, an independent candidate must file a petition of candidacy with the appropriate filing officer not more than 46 days before the special election and not less than 32 days before the special election.
(Emphases added). We construe these sentences as addressing placement on the ballot, and thus, to the extent that these sentences modify the procedure set forth in NRS Chapter 293, they control. This interpretation further gives meaning to NRS 304.240(1)'s phrasing "[e]xcept as otherwise provided in this subsection."
With this two-step process in mind, under NRS 304.240(1), the individual designated by the major political party's central committee, in compliance with NRS 293.165, may be placed on the ballot when, having become "[a] candidate of a major political party," he or she "is nominated" for the special election "by filing a declaration or acceptance of candidacy within the time prescribed by the Secretary of State pursuant to NRS 293.204." This process results in a single candidate for each major political' party, and harmonizes NRS 304.240(1) with NRS 293.165(1).
It also is consistent with Brown and historical Nevada practice under NRS 293.165 and its prior iterations. Where, as here, new legislation is passed but old legislation is retained, continuity of legislative purpose is inferred. "[N]ew legislation usually ties to past experience and prior enactment.. . . Instead of the sudden, sporadic, and unexpected enactment of unprecedented legislation the ordinary legislative enactment. . . expands or restricts the regulation of former acts, but seldom breaks with the principle of regulation expressed by its predecessors." 2A Sutherland Statutory Construction § 45:10 (7th ed. 2007). Counsel for Secretary Miller conceded at oral argument that, to fill a House vacancy by special election before 2003, there would only be a single candidate for each major political party, who would have been chosen by the party central committee under NRS 293.165(1). Far from repudiating NRS 293.165(1) in NRS 304.240(1), the 2003 Legislature appears to have incorporated it by express reference, leaving it to lawyers and courts to argue whether NRS 293.165(l)'s method is "otherwise provided" in NRS 304.240. Reasonable policy arguments exist on both sides of the question of how a special election ballot should be populated.[8] The policy choice is for the Legislature, not the court. But in assessing the meaning of the election statutes involved in this appeal, we look to existing law and historical practice, which the Legislature did not disavow.

CONCLUSION
The lack of specifics in NRS 304.240, combined with the absence of regulations adopted in conformity with NRS 304.250, has created statewide confusion regarding the proper process for the selection of candidates for the 2011 special election to replace Congressman Dean Heller.[9] While this court might typically defer to a Secretary of State's interpretation of an ambiguous election statute, when the Secretary of State fails to follow NRS 304.250's mandate to adopt regulations for conducting a special election to fill a vacancy in Nevada's representation *10 in the United States House of Representatives, and instead relies on the May 2, 2011, official interpretation process, such deference is inappropriate. Our interpretation of NRS 304.240(1) most faithfully provides meaning to all parts of the statute and properly accounts for the lack of legislative intent to abrogate this court's historical construction of similar statutes used for filling vacancies in office, as set forth in Brown.
Therefore, since we agree with the result reached by the district court, albeit for different reasons,[10] that NRS 304.240(1) is best construed as anticipating major party central committee designations for placement on the special election ballot, we
ORDER the judgment of the district court AFFIRMED.
CHERRY, J., dissenting:
The majority declines to give deference to the Secretary of State in this important congressional election matter, reasoning that regulations addressing an NRS Chapter 304 special election were never promulgated. Because the Secretary of State has ample authority to issue official interpretations of Nevada's election statutes, I would defer to Secretary Miller's May 2, 2011, officialand reasonableinterpretation of NRS 304.240. Therefore, I dissent.
Nevada's Secretary of State serves as this state's chief elections officer, and in that role the Secretary is responsible for executing and enforcing all state election laws. NRS 293.124; accord Secretary of State v. Burk, 124 Nev. 579, 588, 188 P.3d 1112, 1118 (2008). In carrying out his duties, the Secretary is authorized to "provide interpretations . . . for the effective administration of the statutes and regulations governing the conduct of primary, general, special and district elections in this State." NRS 293.247(4) (emphasis added). Given that Secretary Miller acted within his NRS 293.247(4) authority in issuing an official interpretation of the special election statute, I cannot agree with the majority's complete removal of any interpretive role for the Secretary of State in this case.
In my view, when the Secretary of State's interpretation reflects a careful study of the relevant material and comports with legislative intent, this court should yield to the Secretary's construction.[1] Here, Secretary *11 Miller, by closely tracking NRS 304.240's language, has provided a reasonable interpretation of the statute to permit major political party candidates to self-nominate and be placed on the ballot.
The practical result of today's holding, for all intents and purposes, is that the majority has read away the entire 2003 amendments to NRS Chapter 304.[2] Consider, for a moment, how this case would have been resolved in 2002, the year before NRS 304.240 was enacted. In 2002, NRS Chapter 304 was less extensive than it is now. The 2002 version of NRS 304.040 directed that United States Representatives be nominated in the me manner that state officers are nominated. 2003 Nev. Stat., ch. 136, § 8, at 766. While NRS 304.030 set up a procedure for the filling of vacancies in the United States Senate, there was no corresponding provision for the United States House of Representatives. Therefore, it appears that the only guidance provided by NRS Chapter 304, as codified in 2002, was to look to how state officers were nominated.
Looking to the version of NRS Chapter 293 in place in 2002, NRS 293.165(1) addressed the procedure for filling vacancies in major or minor party nominations, and permitted party central committees to fill any vacancy in nomination. 2003 Nev. Stat., ch. 311, § 4, at 1703. Under this court's decision in Brown v. Georgetta, 70 Nev. 500, 509, 275 P.2d 376, 380-81 (1954), the NRS 293.165 procedure for filling vacancies in nomination could also be applied to vacancies in office, since there was no meaningful distinction between a vacancy in office and a vacancy in nomination. In that decision, the court was forced to grapple with the situation where there was no statutory procedure in place for an election addressing unexpired terms in Nevada's representation in the United States Senate. Id. at 501-02, 275 P.2d at 376-77.
Beyond NRS 293.165, there were no other statutes in the 2002 version of NRS Chapter 293 addressing the filling of candidate vacancies. The Legislature's enactment of NRS 304.240, however, expressly removed a statutory void regarding procedures for conducting a special election under the circumstances here. Thus, I conclude that there is simply no need for this court to follow Brown's effective instructions to apply NRS 293.165, regarding major party central committee candidate designations, since, with NRS 304.240's enactment, the Legislature has functionally replaced Brown and provided instructions, as reasonably construed by Secretary Miller, to apply the "free-for-all" election format.
While, in 2002, NRS Chapter 304 did not expressly provide a special-election process for the filling of vacancies in the United States House of Representatives, NRS Chapter 293 did appear to anticipate some sort of role for special elections. See NRS 293.175(5)(a) (explaining that, for special elections, the provisions of NRS 293.175 through NRS 293.203, inclusive, do not apply); NRS 293.247(1) and (2) (directing the Secretary of State to adopt regulations for the conducting of, among other things, special elections providing the method for declaring and accepting candidacy or filing any petition required by the general election laws).[3]
Thus, analyzing a vacancy in office under NRS Chapters 293 and 304 as codified in 2002, a vacancy in the United States House of Representatives could be filled by a special election, although the exact procedures for such an election were not established. Under this court's caselaw, however, specifically Brown, 70 Nev. 500, 275 P.2d 376, NRS *12 293.165(1) would be implemented to fill the vacancy in office. In other words, today's majority decision provides a method for conducting a special election to fill a vacancy in Nevada's representation in the United States House of Representatives in the exact same manner that the election would have been held in 2002. Thus, under the majority's view, the 2003 amendments to NRS Chapter 304 must have absolutely zero meaning. This view simply cannot be correct, since NRS 304.240's legislative history makes clear that the Legislature was of the mind that the statute was intended to create procedure for conducting special elections. Thus, common sense dictates that the amendments to NRS Chapter 304 cannot result in the same exact process as before these statutes were enacted. I find Secretary Miller's determination that a "free-for-all" election was intended to be a reasonable attempt to draw meaning from the simple fact that NRS Chapter 304 was amended.
While it is certainly not the role of this court to select the method for conducting a special election, as this is an issue replete with policy and political concerns, a so-called "free-for-all" process has been defended as a reasonable choice among varying options. One theory behind the basis for "free-for-all"-type elections, recently adopted in states such as California, Louisiana, and Washington, is that modern governmental activity, rather than promoting collective problem-solving and constituent concerns, focuses excessively on the struggle for power between the major political parties. See, e.g., Mickey Edwards, How to Turn Republicans and Democrats Into Americans, The Atlantic Monthly, July/August 2011, at 102 (former United States Congressman's views of perceived concerns and proposed solutions regarding the role of increased partisanship in Congress). Under this theory, political party control of access to the ballot only exacerbates such a situation, by reinforcing party dependence and partisanship over independent exercise of judgment and compromise by our elected leaders. Id. "Free-for-all" elections can therefore be useful by providing a degree of separation for our elected leaders from party insiders and narrow ideological activists. Id.
I make no comment on the wisdom of a "free-for-all" election procedure, but because Secretary Miller, this state's chief elections officer, under a proper use of authority, constructed NRS 304.240 in a manner that reasonably tracked the statute and resulted in an election procedure nationally recognized as legitimate, I would defer to that interpretation.
NOTES
[1] The dissent claim that the practical effect of today's holding reads ". . . away the entire 2003 amendments to NRS Chapter 304," is in error. Prior to the amendments, our election laws did not provide for replacing House members in the event of emergencies or set any time tables for doing so.
[2] The sentence-by-sentence exegesis of the text of NRS 304.240(1) that the Nevada Democratic Party offers is unpersuasive. "It is always unsafe to construe a statute . . . by a process of etymological dissection. . . . An instrument must always be construed as a whole and the particular meaning to be attached to any word or phrase is usually to be ascribed from the context, the nature of the subject matter treated, and the purpose or intention of the . .. body which enacted or framed the statute or constitution." 2A Sutherland Statutory Construction § 46:05 (7th ed. 2007) (citing Addison v. Holly Hill Fruit Products, 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944)).
[3] The Republican Party also argues that Secretary Miller's interpretation of NRS 304.240(1) violates its First Amendment associational rights under the United States Constitution. In light of our resolution of this appeal, we need not reach this issue. And to the extent that Secretary Miller argues that a construction of NRS 304.240(1), which permits major party central committees to designate one party nominee, unconstitutionally limits access to the special election ballot, we conclude that this argument lacks merit.
[4] We reject our dissenting colleague's conclusion that the Secretary of State's statutory interpretive powers effectively satisfied NRS 304.250's requirement that regulations be adopted. The Secretary of State is empowered to adopt administrative regulations pursuant to the process set forth in Nevada's Administrative Procedure Act (APA). See NRS 233B.020(1) (explaining that the APA is intended to establish minimum procedural requirements regarding regulation and adjudication within the agencies of the executive branch); NRS 233B.031 (defining agency to generally include, among other things, any officer of the executive branch); NRS 233B.039 (exempting entities from the APA, but not the Secretary of State); see also NRS 233B.038 (noting that the regulation requirements do not include an interpretation that the agency has separate statutory authority to issue). When regulations are adopted, however, certain procedural protections must be followed. See, e.g., NRS 233B.040 (requiring agency regulations to include a citation of the authority pursuant to which it was adopted and the address of the agency along with a brief explanation of the procedures for obtaining a clarification of or relief from the regulation); NRS 233B.060-.0609 (providing notice requirements before the adoption of regulations); NRS 233B.061 (providing the opportunity for public comment with respect to proposed regulations). In our view, these procedures, which are more extensive than those accompanying the Secretary's statutory authority to issue interpretations of Nevada's election laws, could have provided a more thorough review of the issues presented by NRS Chapter 304.
[5] The statute authorizing the Senate appointment, 1929 Nev. Compiled Laws § 2593, provided that "[i]n case of a vacancy in the office of United States senator caused by death, resignation, or otherwise, the governor of Nevada may appoint some qualified person to fill said vacancy, who shall hold office until the next general election, and until his successor shall be elected and qualified." Brown, 70 Nev. at 502, 275 P.2d at 377.
[6] Secretary Miller and the Nevada State Democratic Party attempt to distinguish Brown by arguing that NRS 304.240(1) provides for the nomination of candidates, and thus the statute eliminates the possibility of a vacancy in nomination and any need to resort to Brown, since, at the time of that decision, there was no statute comparable to NRS 304.240(1) to fill vacancies. Because we conclude that former Congressman Heller's resignation created a vacancy in office and that, for the reasons set forth below, NRS 293.165 must be read together with NRS 304.240(1) to establish the special election nomination and ballot placement procedure, we are not persuaded by these attempts to distinguish Brown. Further, to the extent that the Nevada State Democratic Party also argues that Brown, in which this court determined that candidates should not be struck from a ballot, is being misused to remove candidates from this special election ballot, we reject this assertion that Brown exhibits a general policy of keeping candidates on a ballot as erroneously attempting to establish a pattern from one set of facts.
[7] Section 2429 was recodified in 1957 as NRS 294.300 through .310, which was then repealed in 1960 as part of the same bill that adopted NRS 293.165. See S.B. 67, 50th Leg. (Nev. 1960). While NRS 293.165 had been amended at various points between 1960 and 2003, we conclude that there is no material distinction regarding the use of party committees to fill vacancies in nomination between the NRS 293.165 version in place when NRS 304.240 was enacted in 2003 and the version of section 2429 interpreted by Brown.
[8] In 2005, Congress passed 2 U.S.C. § 8(b)(3), which provides for special elections in extraordinary circumstances to repopulate the House of Representatives, with the political parties entitled to nominate candidates to do so within 10 days of the vacancy being announced, unless the State specifies another method, including the use of a special primary, that is as expeditious. Our research demonstrates that, of the many states that have a special election procedure in place to fill congressional vacancies, only Hawaii and Texas have adopted the self-nominating process for which the appellants contend. While appellants cited to the Louisiana amendment as creating an election process similar to a "free-for-all" election, this interpretation of Louisiana law appears to be incorrect as Louisiana Revised Statutes section 18:1278 (2011) fills vacancies in the United States House of Representatives by special primary elections and then a special general election.
[9] That NRS 304.240(1) contained latent ambiguities might not be entirely surprising. As this court noted in Brown, whether "perfection in the election laws could be achieved, no one would have the optimism to assert." 70 Nev. at 507, 275 P.2d at 379.
[10] We reject the district court's reasons for refusing to grant deference to Secretary Miller's interpretation of NRS 304.240(1) and its interpretation of the statute. The district court applied the wrong standard. In its order, the court stated that the Secretary's interpretation was not entitled to deference because the matter was a "purely legal question," and under its interpretation, the Secretary's construction was "unreasonable and absurd." Deference may be afforded a Secretary's interpretation of a statute if it is reasonable and does not conflict with legislative intent. See State, Div. of Insurance v. State Farm, 116 Nev. 290, 293, 995 P.2d 482, 485 (2000) (stating that an agency interpretation of an ambiguous statute may be stricken when this court determines that the agency's interpretation is unreasonable or conflicts with legislative intent). Although we ultimately conclude that the statute most likely was intended to direct party central committee designations for nominations to the ballot, Secretary Miller's interpretation, while not completely persuasive, provided at least one fair explanation for NRS 304.240(1)'s language. See Rosenstein v. Steele, 103 Nev. 571, 575, 747 P.2d 230, 233 (1987) (noting that this court will affirm a district court's order if it reached the right result, albeit for different reasons).
[1] This is the approach taken by other states. See, e.g., Colorado for Family Values v. Meyer, 936 P.2d 631, 632-33 (Colo.Ct.App.1997) (reviewing the Colorado Secretary of State's decision that a corporation violated Colorado's Campaign Reform Act in connection with efforts to prevent repeal of a constitutional amendment and stating that "although the appropriate construction of a statute is a question of law, and appellate courts engage in de novo review, the Secretary of State's construction of the Act is entitled to great deference because her office is charged with enforcement of the law"); Gormley v. Lan, 88 N.J. 26, 438 A.2d 519, 525 (1981) (stating that "great deference" was warranted to the Secretary of State, whose interpretation would not be overturned unless it was "manifestly corrupt, arbitrary or misleading"); see also Californians v. Fair Political Prac. Com'n., 61 Cal.App.4th 472, 71 Cal.Rptr.2d 606, 613 (1998) (reviewing the validity of an emergency regulation provided by California's Fair Political Practices Commission and stating that "[b]ecause of the agency's expertise, its view of a statute or regulation it enforces is entitled to great weight . . . . particularly . . . where . . . the quasi-legislative decisions of the Commission involve controversial issues that would entangle the courts in a political thicket'" (internal quotations and citations omitted), and noting that the United States Supreme Court had deferred to the federal counterpart to the California agency, the Federal Election Commission, in Federal Election Commission v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 37, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981)); Barbour v. State ex rel. Hood, 974 So.2d 232, 240-41 (Miss.2008) (applying administrative law deference to the Mississippi Governor's construction of the state's statute addressing vacancies in the office of United States Senator of Mississippi).
[2] In response to footnote 1 in the majority order, the majority misconstrues my point that the primary purpose behind the 2003 NRS Chapter 304 amendments, the structuring of a process for House special elections, is being unnecessarily read away.
[3] It does not appear that the Secretary of State promulgated special election regulations pursuant to NRS 293.247 prior to NRS 304.240's enactment.